UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| APRIL MARKIEWICZ | CIVIL ACTION NO. |
| v. | |
| GALLAWAY, JOHNSON, TOMPKINS, BURR, AND SMITH, APLC | JUDGE:<br>Magistrate Judge: |

## AMENDED AND SUPPLEMENTAL COMPLAINT
(Jury trial requested

### Jurisdiction and venue

1. Jurisdiction is based on 28 USC sec. 1343 and venue in this district is proper because all conduct complained off occurred within this district.

### Right to sue

2. Plaintiff obtained a Right-to-sue letter dated February 21, 2020.

### Parties

3. Plaintiff is April Markiewicz who was at all relevant times a disabled, female employed from April 3, 2008 to May 31, 2019 (Sunday) as a legal assistant.

4. Defendant, Gallaway, Johnson, Tompkins, Burr, and Smith, APLC is a law firm employing between 200 and 500 people.

### Count 1 - Retaliatory Termination

   a.   **Allegation of pretext and FMLA retaliation**

5. On May 28, 2019 (Thursday) shortly after 5 pm plaintiff gave written notice of medical leave via a calendar entry notification directly to Doris Bobadilla (Managing Shareholder of the Mandeville office, with a substantial EEOC

      practice); Andrea Albert (Shareholder, overseeing HR and personnel issues); David Moragas (Director); Jason Freas (Associate); and others.  The purpose of the notice was to notify them of plaintiff's husband's post-op appointment (requiring two days in Houston) after his cancer surgery and of her two upcoming carpal tunnel surgeries (one for each hand on two Fridays with less than a week off for each hand).  All appointments were in July

6. Plaintiff did not designate either request as FMLA, workers' compensation, or PTO absences, thinking that, as before, she would discuss how to charge this absence with Ms Candice Herrington (the office manager) the next day. However, Ms Herrington was not at work, and plaintiff assumed she would be able to talk to her on Monday.

7. For plaintiff's husband's surgery, Ms Herrington had instructed her to fill out FMLA paperwork and plaintiff did so.  She expected to do likewise for his post-op appointment.  However, plaintiff had no idea how to charge her own surgery and expected to have this discussion with Ms Herrington. Historically, plaintiff had taken PTO and unpaid leaves for migraines and neck issues; her husband's cancer treatment; and her carpal tunnel syndrome.

8. However, the next event was her termination purportedly for "working through my lunch time."

9. Plaintiff was terminated May 31, 2019 (Sunday) orally by Ms Albert (shareholder, handles personnel issues) and Mr Hassinger (managing partner) over a speaker phone from the office while at home.  The stated termination reason was for "working through my lunch." She did not get a pink slip. The termination reason was pretext.

10. She alleges the real reason termination was retaliation for asking for FMLA time off for her husband and her.

    b. **Unauthorized PTO charges/ write-up for "stealing" lunchtime/ plaintiff's prior lunchtime practice (2018)**

11. In early-2018 plaintiff noticed that if her weekly payroll hours dropped below 40 because, for example, she took off unpaid time for an errand at the end of the day, someone was adding PTO compensation to bring her hours up to 40 per week.  Someone was going into her account without her authorization or

notice to her.

12. Plaintiff raised this issue with Ms Albert. She advised she would look into it; weeks went by.

13. When she got back to plaintiff, Ms Albert confirmed that someone had indeed been going into her account and they would address this. But she also stated that they had noticed plaintiff was taking lunch (spending time in the kitchen), but not clocking out. She instructed plaintiff that she must clock out for a minimum of 30 minutes for lunch and that if she had to work through her lunch she must notify her direct attorneys, Ms Bobadilla or Ms Albert, or Ms Herrington. She presented plaintiff with a write up which accused her of the above lunch time abuse and stated that if she did not sign it, refusal to sign would be grounds for termination. Plaintiff objected that the accusation was false, but signed.

14. Since very early in plaintiff's employment she had worked through lunch two-three times per week without clocking out and without reprimand until this occasion.

15. She complied with this instruction. She continued to work through her lunch as before without clocking out, but now would walk by Ms Albert's office and advise her she was working through lunch or she would walk by plaintiff's work space and she would so advise her. Plaintiff would occasionally so advise Ms Herrington. Sometimes there was no one in her work group to whom she could report.

16. The practice of charging her PTO without authorization ceased, but the employer began to pressure her to use PTO.

    c.    **Lunchtime, etc write-up /pressure, then requirement, to use PTO (2019)**

17. In late December 2018 Ms Albert called plaintiff into her office. The firm had averaged her monthly hours for the year. She had been traveling for medical treatment for her husband's cancer and to see family because of the potentially fatal nature of the cancer. Ms Albert remarked that she was now at the level of a part time employee such that the firm could take away her health insurance and that "would not be good for your husband right now given his condition."

18. Plaintiff objected that she had gotten the firm's approval for travel in early 2018. (She had also emailed these dates to co-employees and offered to work around them if her co-employees had conflicts. No one did.)

19. Ms Albert replied that the employer would re-evaluate her work time in March 2019. The firm "could not have a repeat of 2018."

20. In February 2019 plaintiff advised management of the cancer surgery date of May 1, 2019.

21. In February 2019, despite compliance with the lunch time policy, at a meeting plaintiff had requested, she was issued a second written warning about not clocking out for lunch and, additionally, now being required to use PTO for any absences, and to cease gossiping.

22. Plaintiff had requested the meeting in order to discuss several ongoing issues that had arisen again shortly before, e.g., pressure to use PTO vs taking unpaid time off.

23. The week before plaintiff had objected strenuously to Ms Albert, among other things, about the increased pressure since early/mid 2018 to use PTO instead of unpaid time off.

24. When she arrived at the meeting plaintiff was immediately confronted with a one-page warning about lunch, mandatory use of PTO, and gossiping. She was again threatened with termination if she did not sign the warning.

25. This reversal of meeting purpose with a threat to fire plaintiff had been typical since 2010 when Ms Bobadilla arrived as the new Managing Attorney. On her second day, she abruptly summoned plaintiff to her first meeting with her and told plaintiff that an alleged working birthday dinner off the clock was grounds to terminate her. (This allegation made no sense.) This type of threat occurred once per year -some years more often - until plaintiff was terminated.

26. Present at this meeting were Ms Albert and Timothy Hassinger (Managing Shareholder of the Mandeville office, replacing Ms Bobadilla).

27. Plaintiff was again told that if she had to work through her lunch she must

notify her direct attorneys, Ms Bobadilla or Ms Albert, or Ms Herrington.

28. Although these termination threats had occurred annually for several years this one appeared more serious because if plaintiff were forced to use PTO for all absences, she would run out of paid PTO to cover medical leaves.

29. Neither at this time nor any later time did the employer explain her rights under FMLA. She did not know that she might have FMLA rights.

30. Plaintiff complied with these instructions. She continued to work through lunch with notice as before.

   **d.   Lunchtime practice for comparable employee**

31. The week before plaintiff was terminated a file clerk, Megan Guidry, was emailed a warning about working through her lunch time without clocking out by Ms Herrington who followed up with a verbal confirmation. Plaintiff did not get any such warning.

32. Accordingly, plaintiff believes that the stated termination reason - "working through my lunch" - was pretext and the real reason was her FMLA request.

### Count 2-FMLA violation

33. Regarding the February 2019 meeting plaintiff had, as above, listed her anticipated medical and vacation absences for 2018 in January and had also noted that she would use medical leave as needed. All three managers (Bobadilla, Albert, and Herrington) had approved this plan. Accordingly, she proceeded as she had in the past to take unpaid leave for short absences and, despite some pressure to use PTO, to conserve PTO for longer leaves for times when she would be drawing a "shorter" paycheck.

34. This schedule worked until about June 2018 when John Getty, Ms Bobadilla's principal associate, and her other associate left. This increased her reliance on plaintiff. Because of plaintiff's scheduled leaves for her husband's cancer issues and her own with her neck and migraines (for which she had six injections usually done on Friday in order to recuperate over the weekend) she was not available as often as Ms Bobadilla needed. (There were also leaves after September 2018 when CTS was diagnosed.) At that

time, Ms Bobadilla, Ms Albert, and Ms Herrington increased their insistence that plaintiff use her PTO and not take unpaid leave, even to the point of requiring her to use ½ hr of PTO to leave early for an errand.

35. In February 2019 when she advised Ms Herrington of her husband's cancer surgery on May 1, plaintiff told her that she was required to use both PTO and FMLA in connection with the surgery.  Plaintiff specifically asked if both had to be used at the same time and Ms Herrington replied affirmatively without hesitation.

36. This was the first time in plaintiff's entire life or in her employment at defendant she had used FMLA.  Neither at this time nor any later time did the employer explain her rights under FMLA.  She did not know that she might have FMLA rights.

37. This ongoing scrutiny of her use of PTO time, without advising her of her FMLA rights, caused her stress and contributed to triggering migraines. Increased migraines might be confirmed by her pharmacy records.

38. This conduct violated her FMLA rights.  She realized after her termination that the employer was also "running out my FMLA clock", that is, by charging her both PTO and FMLA, they were running out both the PTO and FMLA "clocks" at the same time.  She would then be at a point where she had no paid PTO time to take in order to make up a short paycheck and not even FMLA time that she could take if needed in connection with her husband's cancer, her own migraines, neck issues, or CTS.  She would have been vulnerable to termination for excessive absences.

### Count 3-ADA harassment and failure to accommodate

**General overview**

34A. In addition to retaliatory termination and FMLA violations, there are issues of years of ongoing ADA hearing and migraine disability harassment and failure to accommodate about which plaintiff had futilely complained since 2012 to Ms Herrington, Ms Bobadilla, and Ms Albert (both in her capacity as Director and, later, as a Shareholder).   The harassment was pervasive and, to the extent it was retaliatory,  would dissuade a reasonable employee from asserting her rights as frequently as necessary.

35A.  Plaintiff was diagnosed with bulging, then herniated, cervical discs (C5-6-7) about 2016.  Beginning in late 2018 there were also issues with respect to carpal tunnel syndrome.  As to these issues there was no harassment, but there was continuing failure to accommodate.

    **a.**    **Hearing allegations**

        **1.**    **ADA hearing harassment (background and actionable)**

36A.  One substantial disability is that plaintiff is hard of hearing from childhood pneumonia which causes her to speak more loudly than normal when on the phone.

    \*    *Background*

37A.  Beginning in late 2010/early 2011, shortly after Ms Bobadilla moved plaintiff to a new cubicle, she began to complain about the volume of her speaking voice, but would not close her office door.  She would visit the office of a nearby attorney, pound on plaintiff's cubicle wall as she left his office and sometimes "shush" her with an exaggerated motion.  She would send plaintiff an occasional email about the volume of her telephone voice.

38A.  Combined these actions occurred 2-3 times per month.

    \*    *Actionable hearing harassment*

39.  In December 2017 (when plaintiff was moved to the new space),  Ms Bobadilla stopped the pounding on the wall, but would tap on a ledge at one end of her new open space, get her attention, and then "shush" her.

40.  Ms Bobadilla increased her emails stating that she was talking too loud and everyone in the office could hear her.  No one else complained.

41.  She also increased "shushing" plaintiff in an exaggerated manner.

42.  Her complaints occurred 2-3 times/mo until termination (even though plaintiff frequently requested a fully enclosed office or sound suppression modifications).

43. The last occasion plaintiff remember Ms Bobadilla harassing her was in the form of an email in April about 1 ½ months before she was terminated. She complained that plaintiff was being loud.

44. Her constant emails and verbal complaints about the level of plaintiff's speaking was pervasive. The harassment interfered with her ability to perform because she avoided or shortened her telephone conversations with clients, even those Ms Bobadilla instructed me to make. She herself did not like to call some clients and would assign those calls to her. Plaintiff is fairly certain she emailed her about the level of her voice even after some of those calls.

   **2.   Hearing - failure to accommodate**

45. Accordingly, beginning in 2011 and through 2019 plaintiff asked the employer two-three times a year to transfer her to an office with a door or to install a sound suppression system like one installed for an attorney in its Gulfport office. Every time plaintiff asked about the system Ms Herrington would tell her they were "looking into it."

46. In April 2019 Ms Bobadilla emailed plaintiff that she was being loud.

47. Plaintiff went to Ms Herrington to ask again for relief to be moved into an office (she had done nothing about sound suppression). Plaintff asked her why she could not just be moved into an office where Ms Bobadilla could not hear her and plaintiff could reasonably position her desk and move her chair. Ms Herrington said she would "look into it."

48. By her termination, defendant had provided neither sound suppression nor a conventional office with a door.

   **b.   Migraine allegations**

   **1.   Migraine harassment**

   \*   *Migraine harassment begins (Background only)*

49. Another substantial disability is migraine headaches.

50. Plaintiff's cubicle lighting (2010-2107) triggered migraine headaches, a fact

known to Ms Herrington (office manager), Ms Bobadilla, and Ms Albert.

51. After a doctor's note in 2013 and renewed requests for transfer one light was removed in her cubicle (despite requests they all be removed and offers to remove them herself - there was still some irregularity that gave her migraines).  However, Ms Bobadilla began to loudly comment, " Wow! I don't know how anyone can see around here. It's so dark."  She made these remarks until plaintiff was transferred in December 2017.

52. Combined, she would subject plaintiff to this conduct at least 3-4 times per month.

   *   *Hassinger begins migraine harassment* (*background*)

53. Shortly after Ms Bobadilla had started her pounding Mr Hassinger also started pounding on her wall. He did this two - three times per month in addition to flicking her light on and off and also doing this when she was in the break room on lunch. The flicking of the lights occurred 2-3 times per month.  These did not increase after the doctor's note and stopped when plaintiff was moved to her "office" in December 2017.

54. Mr Hassinger's harassment stopped in December 2017 when plaintiff was moved to another work space.   This was 4 ½ years after she had submitted her doctor's request.  During this period there were several fully enclosed vacant offices, but she was never moved to one.

   2.   **Migraines - Failure to accommodate**

55. Migraine headaches were also aggravated by the employer's misconfiguration of her new work space with respect to her desk.  Plaintiff would frequently have to look to her left from her computer monitor to talk to associates and others, but could not rotate the desk to avoid the looking because it was too long for the width of the office.

56. Flickering fluorescent lighting over her work space; office noise; computer monitor glare; office cleaning materials; and office odors added to the migraine headaches.

57. When she complained about the lighting, Ms Herrington suggested several

times, "I don't see why you don't just turn them all off." This was impossible because her cubicle lights were part of a panel of lights for the two adjacent cubicles and turning off her lights would have turned them all off.

58. Accordingly, she began seeing her doctor in 2012 for relief for the migraines and neck pain.

59. Despite her doctor's request in December 2013, the employer refused to transfer her to one of the vacant offices with proper placement of the monitor (and other equipment) and lights that did not flicker. She was not transferred to a new cubicle (a "nook") until December 2017.

60. The new work space, was not fully enclosed - one wall was fully open - and it was right next to Ms Albert's office and two doors down from Ms Bobadilla's office. (Both were fully enclosed.) The lighting was better in that plaintiff could occasionally turn it off, but the "office" was next to the copy room and catty-corner from the conference/ deposition room so it was noisier; and the office chemical smells continued until the end of her employment because Ms Herrington bought cleaning chemicals from a company for which she worked. The computer monitor glare was worse because of a window (even with blinds). The migraines continued.

61. In addition, every three to four years defendant undertook major renovations during work hours. The sheetrock and fiberglass dust, jack hammers and drills, painting and carpet installation with various glues triggered migraines. When plaintiff requested sick leave, she was told by Ms Herrington that she could not leave.

### *Strong perfume introduced - increases migraines; failure to accommodate*

62. In November 2018 the employer hired a woman who was a chronic smoker and used excessive perfume several times a day to conceal the smoking odor. This triggered plaintiff's migraine headaches to the point of swelling her face, blurring her vision, and causing her to vomit at work. She overused her prescriptive medicine and could not work, however, Ms Herrington, as with the renovation work, advised that she was required to stay until 5 pm and that if she left it would be viewed as insubordination.

63. Plaintiff asked Ms Herrington several times to talk to the employee, but she directed plaintiff herself to talk to the employee.

64. Another employee made the same request and Ms Herrington promptly sent out an email advising that there were some employees who were sensitive to perfumes and requesting they be aware of these sensitivities.

65. However, this employee continued to wear a strong perfume until her termination such that plaintiff would have related symptoms every day, including nausea, blurred vision, vomiting, sensory sensitivities.

66. In February 2019, Ms Albert exclaimed in a mocking voice: "You're always calling in sick because of your m-i-i-i-igraines!"

67. Plaintiff continued to complain about the perfume until the week before her termination.

68. This was a failure of accommodation.

   c.   **Herniated cervical discs - Failure to accommodate**

69. Her other substantial disability was a bulging, then herniated, discs in her right cervical spine which were also aggravated by the employer's misconfiguration of her new work space.

70. As to the right cervical discs, the new space was configured such that plaintiff had to constantly turn to her left to answer questioners at the "ledge" at the front of her space. She asked for the accommodation of turning her desk to face the ledge, but that could not be done because the length of the desk was greater than the width of the space. Defendant refused to get a smaller desk because there was no room to store the current desk. Turning to the left aggravated the right cervical discs which triggered migraines.

71. Plaintiff could not take medicine for her neck because it impaired her work performance so she took migraine headache medicine. This relieved the headache, but not the pinched nerve pain in her neck.

72. Accordingly, she had four medial branch blocks which indicated rhizotomies on the right and left. (A rhizotomy burns nerve endings, but does not fix the

herniated discs. It kills the pain and has to be repeated every one-two years.) For all of these procedures she underwent six total anesthesia. After about the fifth procedure, Ms Bobadilla required her to return to work the same day while plaintiff was still coming "out from under." Plaintiff was still wearing pajamas and her wrist band at work. The last of these blocks was in October 2018.

73. During the course of and after these blocks, plaintiff asked Ms Herrington several times for another office.

74. When defendant would hire new people plaintiff would suggest that she had seniority and should be offered a vacant office before a brand new employee. When she was fired there was a vacant office.

75. One occasion was in November 2018 when Ms Herrington vacated her office. Plaintiff asked for it but was told that defendant was giving it to two file clerks. Plaintiff suggested they could be put in her "office."

### d. Another failure to accommodate - CTS

76. In September 2018 plaintiff was diagnosed with CTS.

77. At the beginning of the work day the keyboard would be at the proper level, that is, her wrists were level. However, as the day progressed the keyboard would sag such that her hands were then sharply angled upward. Accordingly, about every 1 ½ hours she would have to adjust a screw device to relevel the tray.

78. About 1 ½ months before the diagnosis, she had noticed a tingling in both arms and asked Ms Herrington for a new keyboard tray.

79. Her response was her usual, "I'll look into it and let you know."

80. A month after plaintiff was diagnosed she asked her again for a new tray - "I could really use a new keyboard tray." Ms Herrington replied, " We're still looking into it."

81. When plaintiff did not get a new tray, she finally went into Ms Herrington's office to ask where she could find a screwdriver to re-attach the mounting,

because it was detaching from the underside of her desk. Thereafter, in addition to tightening the screw device, she also re-tightened the mounting screws about once a week.

82. In March of 2019 plaintiff got a new keyboard, but not a new tray. The tray continued to sag and detach and plaintiff continued to type with her hands at a severe angle. About a week after the keyboard arrived plaintiff told Ms Herrington that the tray continued to wobble and the desk was falling apart and should be replaced.

83. Failure to address tray and desk issues was a failure to accommodate.

### e.  Comprehensive failure to accommodate

84. When plaintiff was terminated in May 2019 she had not gotten accommodations for any of these conditions. (The new chair with which she was provided was not intended to address these conditions and did not do so.)

85. At the new "office" to which she was moved in December 2017 she still could not comfortably position her desk. The neck pain and migraines continued. CTS was diagnosed September 2018.

86. In about August 2018, realizing that the new "office" was making all her disabilities worse, she again requested accommodations in the form of a conventionally sized office with a door from Ms Herrington. At this time, there was a vacant office. Her response was that plaintiff would have to talk to Ms Bobadilla because they were hiring someone to assist plaintiff and did not know where they would put her. Plaintiff suggested that the new hire could have her space. Ms Herrington stated she would run it by Ms Bobadilla.

87. However, the new hire was assigned the vacant office even though plaintiff had always been told vacant offices were reserved for attorneys and paralegals. The new hire was neither.

88. When the new hire quit at the end of September 2018, plaintiff asked again about the (again) vacant office. Thereafter, plaintiff asked for a new office to address all her disabilities several more times.

89. Beginning in October 2018 through late February 2019 plaintiff repeatedly asked Ms Herrington for accommodations for her neck pain, migraines, and CTS.  She promised a sound suppression system, but it never materialized.  One such was the request of Ms Herrington for her old office in November 2018.

90. In April 2019 she asked again as above when Ms Bobadilla sent her an email about being too loud.

91. Failures to accommodate plaintiff with a conventional office for her hearing, migraines, and neck pain (which might have also addressed the CTS) and a level keyboard tray for her CTS were actionable failures.

**Count 4 - Gender-based harassment - background and actionable harassment**

92. Plaintiff was subjected to two such types harassment, one by Ms Bobabilla and Ms Albert and another by John Getty, an associate attorney who was hired in December 2011 and worked directly for Ms Bobabilla.

93. The harassment by Ms Bobabilla and Ms Albert took the form of criticizing her for not "being more like the other ladies."  Plaintiff did not fit the female stereotype.  The harassment by Getty was of a physical type in that he repeatedly threatened to strike plaintiff.  His harassment ended when he left in July 2018.

94. Both forms of gender harassment started about the same time.

   a. *Gender harassment by Getty (background)*

95. Plaintiff was subjected to gender based harassment by an associate, John Getty, beginning soon after he was hired in December 2011. In early February 2012 she came into his office to discuss his work calendar and work preferences.  He immediately stated, "I never felt like punching a girl in the face until now."

96. That same week on Friday when all or most of the associates had left early, plaintiff remarked that it was quiet and he was the only associate still there.  He replied, "I will use any force necessary to protect herself.  I am a violent man...you have never seen me angry."

96A. The first occasion of gender harassment by Ms Bobadilla plaintiff remembers was in February 2012 when she first complained to Ms Bobadilla about physical harassment by Mr Getty. She replied, "Connie and all the ladies do not have these issues." This harassment continued in one form or another until her termination.

97. In late 2012 he referred to me as "Bitch." Other employees have told me has used this term about her.

98. In about 2014, he was moved for unrelated reasons to another office and would buzz her on the phone. When she would answer she would sometimes have difficulty hearing him, ask for clarification, and he would then scream and yell at her and hang up.

99. He would summon her or she would walk down to his new office and ask for instructions. He would clench his fists and shake them at her. After he had threatened to punch her in the face, he frequently said, "There's something about you!" while cursing and balling up his fists and pounding them on his desk. These incidents occurred at least 2-4 times/month. On many of these occasions plaintiff emailed a memo to herself.

100. On at least three occasions in the break room while holding a dinner knife in his hand he would just look at her and smirk.

101. On other occasions he made physically threatening and other derogatory remarks about plaintiff and other females. These events would occur on the average several times a week.

102. After two or three years she met with Ms Albert and Mr Getty and Ms Albert advised him to stop.

103. Returning to 2012, after plaintiff complained about him to Ms Bobadilla in February 2012, Getty began to require extra editing duties of her, throw drafts at her, and monopolize her time even though she was working for six attorneys.

104. These incidents occurred with less frequency until he left in July 2018 despite her 10 or more complaints to Ms Bobadilla and Ms Albert about Getty. They always said, "You're the best one for the job" and "You can handle it."

105  When he left Ms Bobadilla and Ms Albert separately exclaimed to plaintiff that she must be happy he was going. Ms Albert suggested that plaintiff must be the happiest one

106. Since she complained about Getty in February 2012 she was excluded from office social events. After she complained about Getty to Ms Bobadilla and Ms Albert she realized both were excluding her from their working group social events. Plaintiff was able to reach this conclusion because Getty at the outset, and despite his later hostility, gave her access to his incoming emails and she would see their invitations were going to all except her. This exclusion continued until mid December 2017.

### B.  Actionable gender stereotyping harassment by Ms Bobabilla and Ms Albert

107. After Ms Bobadilla's response when plaintiff complained about Getty's threat, over the years, Ms Albert referred to the behavior they expected of her in about half of the quarterly staff meetings and Ms Bobabilla would do so in the annual "termination" meetings. Their remarks were in the form of "We all need to be like Connie (or the other ladies)." While Ms Albert was making her remarks she would turn her head and look directly at her.

108. Plaintiff was able to infer who they meant by the "other ladies" because Ms Bobadilla and, especially, Ms Albert would make remarks such as "Julie's so positive and friendly"; "Cathy exuded positivity - she's always so chipper and everyone likes her." Candice was complimented for always being upbeat. Hope and the other female staff members were generally spoken of in the same positive terms.

109. Every time Ms Bobadilla called her into a "annual" meeting she referred to her to as "negative" and accused her of "bringing down office morale."

110. None of these complaints about her were performance related. She was at or near the top of the wage scale for the support staff and worked for six attorneys.

111. In late February 2019 when she complained to Ms Albert that Ms Bobadilla had a problem with her "as a woman", she replied, "No, no, no. We're not going to talk about that. We are not going to go there."

112. After February 2019 plaintiff found that co-employees who had formerly gravitated toward her, were not reciprocating her friendliness. Because of this, she stayed increasingly by herself.

113. Management complaints about her conduct differing from that of the "other ladies" continued to the end of employment and contributed to triggering migraines.

114. Since termination plaintiff has been unable to find other than temporary work because the employer has controverted her workers' compensation claim for related carpal tunnel surgery and she have been medically restricted from work.

115. Had she not been terminated, she would have gotten the surgery under either a compensation claim or her own insurance policy (now cancelled) and returned to work as noted above.

## Relief sought

116. Accordingly, plaintiff requests past lost wages and benefits since termination; damages for harassment in the form of Ms Bobadilla's emails, "shusing" and pounding on her wall; physical pain and suffering and emotional distress from the related migraines and the illegally delayed carpal tunnel surgery; future lost wages and benefits for up to seven years; punitive damages; legal interest; attorney fees; costs; and trial by jury.

Respectfully submitted,
/s/ J Courtney Wilson 13561
J Courtney Wilson
1510 Veterans Blvd
Metairie, La 70005
(T) 832-0585
(F) 846-2400

PLEASE DO NOT ISSUE SUMMONS
NOTICE AND WAIVER WILL BE ATTEMPTED